HUDSON v. NEW YORK & ALBANY TRANSP. CO. et al. (EMPIRE TRUST CO., Intervener.)

(Circuit Court of Appeals, Second Circuit. July 12, 1910.)

No. 321.

1. MARITIME LIENS (§ 60*)—JURISDICTION OF CIRCUIT COURT—SALE OF VESSEL FREE FROM LIENS.

While proceedings against vessels in rem to enforce maritime liens are vested exclusively in the District Courts, a Circuit Court could sell vessels free from such liens, if the lienors voluntarily submitted themselves to the Circuit Court's jurisdiction.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 98; Dec. Dig. § 60.*]

2. MARITIME LIENS (§ 60*)—JURISDICTION OF CIRCUIT COURT—SALE OF VESSEL FREE FROM LIENS.

If holders of maritime liens against vessels come into the Circuit Court having possession of the res, and ask for adjudication upon their liens, they should be held to have assented to the jurisdiction of the Circuit Court for all purposes, including a substitution of the proceeds of sale for the res whenever in the sound discretion of the court, such substitution is necessary to preserve the property from deterioration or secure a better price for it.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 98; Dec. Dig. § 60.*]

3. MARITIME LIENS (§ 68*)—SALE—CONFIRMATION—MISREPRESENTATION BY AUCTIONEER.

Claims amounting to $62,710.16 were filed against the owner of vessels, of which $54,310.16 represented claims for which maritime or state liens were asserted. A receiver's sale of the vessels subject to such liens was ordered. Prior to the sale certain lien claims had been rejected or withdrawn, leaving only $34,226.33 outstanding, so far as was known. The auctioneer by inadvertence gave notice to proposing bidders that the amount of liens claimed against the vessels was between $55,000 and $60,-

000. *Held*, that the bidders were entitled to rely upon the representations of the auctioneer as the mouthpiece of the receiver; the receivership having been in existence for six months, and a special master having been appointed to consider claims, and the sale should not have been confirmed on account of the misrepresentation.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 106; Dec. Dig. § 68.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

Action by George P. Hudson against the New York & Albany Transportation Company and others, in which the Empire Trust Company, as trustee, intervenes. From an order directing a receiver's sale of property, and an order confirming the sale, the intervener appeals. Order of confirmation reversed and order directing the sale affirmed.

See, also, 175 Fed. 519.

This cause comes here upon appeals from an order directing the sale by a receiver of certain property and from an order confirming said sale.

Complainant, as a stockholder of the New York & Albany Transportation Company and the holder of 90 per cent. of its bonds, brought suit against the company alleging waste, insolvency, and threatened litigations, and praying that its assets be marshaled and distributed according to the practice of equity. Certain lienors of record were joined as defendants. The Empire Trust Company, as trustee under the mortgage, intervened and filed bill of foreclosure. Various claims of alleged creditors were filed which were sent to a special master to take proof as to validity and priority. Hearings thereon were concluded about July 9, 1909; the total amount of claims considered by the special master being $62,710.16. Claimants to the amount of $54,310.16 asserted that they were preferred most of them on the ground that they were secured by maritime liens or liens under state law for labor, materials, and supplies furnished on the credit of the vessels, to steamboats owned by the company.

The company owned two large river steamboats, the Saratoga and the Frank Jones, which constituted its principal asset. On July 9, 1909, after the conclusion of the hearings before the special master, but before he had filed his report, the Morse Dry Dock & Repair Company, a creditor to the amount of about $13,000, and one of the lienors under the state statutes, filed a petition. It set forth that the steamers were then lying at the wharf, greatly in need of repairs, especially painting, and that, unless these repairs were speedily affected, the boats would deteriorate rapidly in value, that the boats were used for passenger traffic on the Hudson river during the summer season, already far advanced, and that it would take two or three weeks to put them in commission. The petition prayed that an order of sale be made, subject to confirmation by the court and that such sale be not held until after the determination of the amount and priority of the liens, so that the various lienors might be intelligently advised as to how much they would be required to bid to protect their claims.

Upon due notice to all parties the petition came on for hearing with a "special report dated the ——— day of July" from the special master. No trace of this report is found in the record, but it is evident from the briefs that it was not a report "determining the amount and priority of the liens" which the petition asked for. On July 19th the court made an order directing the sale on July 27th of these two vessels "subject only to maritime liens or liens under a state law for supplies, labor or materials furnished on the credit of said vessels." The Empire Trust Company at once moved for a resettlement of this order, objecting that by its terms "the said property although of large value may be sold subject to said unascertained maritime liens. etc., for a nominal price." The motion came on for hearing on July 26th, and was apparently denied. We find no formal denial of it in the record, but, since the sale

was had under the order of July 19th, it is safe to assume that there was such denial.

The sale took place on July 27th, and both boats sold, subject to state and maritime liens, for $7,500. Upon the application for an order confirming the sale, various affidavits giving estimates of the value of the boats and reciting what took place at the sale were submitted; also a petition of the Hudson Navigation Company, which was represented at the sale, stipulating upon a resale to make a bid for the vessels, subject to all liens, of $16,000, and accompanied with the offer of a cashier's check for that amount as a guaranty. On July 29th order was entered confirming the sale, with a brief opinion indicating the reasons for doing so. On August 27, 1909, the special master filed his report rejecting all claims of preference except for $18,550.40, all of the preferences so allowed being still a subject of contest in another branch of this suit.

The Empire Trust Company duly appealed from the order directing a sale and from the order confirming the sale.

Cowing, White & Wait (H. C. White, and Rufus B. Cowing, Jr., of counsel), for appellant.

Kelley & Connelly (N. E. Kelley, P. M. Brown, J. D. Fearhake, and C. S. Lorentzen, of counsel), for appellees.

Before LACOMBE and NOYES, Circuit Judges, and HAND, District Judge.

LACOMBE, Circuit Judge (after stating the facts as above). We think it was most unfortunate that the sale was had subject to all maritime and state liens. The circuit judge so ordered evidently because he was satisfied that he had no power to sell the res free from any of them, leaving the lien to apply to proceeds. It is undoubtedly true that proceedings against vessels in rem to enforce maritime liens are vested exclusively in the District Courts of the United States. The circuit judge cites Moran v. Sturges, 154 U. S. 256, 14 Sup. Ct. 1019, 38 L. Ed. 981, and there are many other authorities on the brief all holding that no court other than the admiralty court can exercise jurisdiction over maritime liens or divest or extinguish them. But in the case cited the court is careful to say that "those courts (other than admiralty) would have no power by a sale under statute to destroy their liens, unless they had voluntarily submitted themselves to that jurisdiction." And elsewhere "(interests) which cannot be displaced by the action of other courts in invitum." But, so far as the record before us discloses, certain of these holders of maritime liens have voluntarily submitted themselves to the jurisdiction of the Circuit Court. The circuit judge says:

"In some of the cases it has been intimated that, if creditors entitled to maritime liens consent to a sale free of liens, a court of equity will have the right to make such decree. Of course, this would apply only to consenting creditors, and I find no evidence of such consent. All persons having been forbidden to interfere with the property in the custody of the court, the appearance of creditors having maritime liens to prove the amount of their claims before the special master in this proceeding in personam cannot be considered such consent. Lien creditors have a right to proceed in personam or in rem on their liens or in both ways until they can obtain full satisfaction."

We have not before us the documents upon which any of these liens came into the controversy, but if any of them pray for a liquidation

and allowance òf the lien, as was prayed in Berwind White Coal Company v. Metropolitan S. S. Company (C. C.) 166 Fed. 782, we are of the opinion that, by thus coming into the court which had possession of the res and asking for adjudication upon the lien, the petitioner should be held to have assented to that jurisdiction for all purposes, including a substitution of the proceeds for the res, whenever in the sound discretion of the court such substitution was necessary to preserve the property from deterioration or secure a better price for it.

There were circumstances connected with the sale, however, which in our opinion should have induced a refusal to confirm. As has been seen the total amount of claims filed was $62,710.16, of which $54,-310.16 represented claims for which maritime or state liens were asserted. Since the sale was to be subject to such liens, it was of the utmost importance to bidders to obtain some reasonably accurate information as to how much they aggregated, and they were justified in assuming that, since the receivership had been in existence for six months and a special master had been appointed to consider claims, the officers of the court were able to give such information. Of these lien claims, aggregating $54,310.16 as filed, there had been rejected or withdrawn prior to sale $20,083.33, so that on the day of the sale there was only $34,226.33 outstanding so far as was known.

It appears by an affidavit of the intervener's counsel that the auctioneer—owing to an inadvertence—gave notice to proposing bidders that the amount of liens claimed against the steamers was between $55,000 and $60,000. An affidavit of an attorney who was present with intending bidders also states that the auctioneer declared that liens to the amount of $65,000 were claimed against the vessels, and that his clients declined to bid upon the ground that they could not make any intelligent bid in view of the statement of the auctioneer. These affidavits were before the circuit judge when application was made for confirmation, and we find nothing in the record which controverts these statements. The circuit judge, commenting apparently on this objection, said:

"All the creditors had, or by the exercise of ordinary diligence in examining the testimony taken before the special master might have had, full information as to the character and status of lien claims."

We do not find this suggestion persuasive. The first object of an auction sale is to get bidders for the property, and it would seem well calculated to defeat that object to hold that bidders are to disregard statements of this character made by the auctioneer, and should in advance of bidding have some competent lawyer make a search of several hundred pages of testimony. We are of the opinion that, on the record before us, the sale should not have been confirmed, and for that reason reverse the order of confirmation. Touching the order of sale, we are not sufficiently advised as to the nature of the petitions which accompanied the claims of the several lienors to determine whether or not the Circuit Court had jurisdiction to sell the property freed from any of the liens, preserving such lien on the proceeds. We therefore do not reverse such order. If the Circuit Court should order a resale, it would, of course, have power to fix the terms and conditions of such

sale. What instructions should be given on remanding the cause to the Circuit Court for further action is a different matter. Manifestly the situation now is not what it was a year ago. If the sale be set aside, the property cannot be retaken from the purchaser without paying him the purchase price $7,500 and whatever further sums may have been expended on the boats in repairs and betterments; indeed, an accounting would be necessary to determine the amount expended in repairs and the difference between the receipts derived from the operation of the boats and the expenses of operation, deterioration, etc. Moreover, in the event of a resale, there would probably be other unknown liens from which the court certainly could not clear the property, viz., liens for labor and materials furnished on the credit of the vessels while operated by the purchaser last season and this year—an element of uncertainty which might well discourage bidders. It would seem that there must be some assurance that a substantial bid will be made before the court should undertake to get the boats back from the purchaser and to resell them.

We have felt that the order should be reversed on this record, so that by affirmance we might not seem to approve a sale where the auctioneer—who is generally considered by bidders to be the mouthpiece of the receiver or master who sells—has made so substantial a misrepresentation. But we are also satisfied that we cannot deal in this court with the complicated situation now presented, but must leave it to the sound discretion of the circuit judge to determine after an examination of existing conditions whether there shall be a resale or whether the former shall be reconfirmed. In the exercise of this discretion the circuit judge should first ascertain what amount, if any, must be paid to the present purchaser as a condition of redelivery of the boats; next, whether the intervening petitions give jurisdiction to sell free and clear of maritime liens; and, if so, then whether there is any purchaser willing to take care of liens which have arisen while the purchaser has had the boats and to pay more than enough to realize net the purchase price after the liens of intervening petitioners have been paid out of his bid. Unless he is satisfied affirmatively that the net result after paying all these charges will be greater than at present, we see no reason for a resale. Should the intervening petitions not authorize a sale free and clear, he can still ascertain whether a resale would be profitable to the estate, subject to all liens, which have arisen before or since the sale.

Costs of this appeal to appellant.

NOTE.—The following is the opinion of Ward, Circuit Judge, in the court below:

WARD, Circuit Judge. The court ordered the sale of these steamers subject to maritime liens and liens under state law for supplies, labor, and materials furnished on the credit of the vessels, because it doubted its right as a court of equity to pass upon and dispose of those liens. Proceedings against vessels in rem are by law vested exclusively in the District Courts of the United States. Rev. St. U. S. §§ 563, 711 (U. S. Comp. St. 1901, pp. 455, 577); Moran v. Sturges, 154 U. S. 256, 276, 14 Sup. Ct. 1019, 38 L. Ed. 981. A court of equity, having no power to enforce a maritime lien, has, I think, no power to discharge it.

180 F.—62

In some of the cases it has been intimated that if creditors entitled to maritime liens consent to a sale free of liens a court of equity will have the right to make such a decree. Of course, this would apply only to consenting creditors, and I find no evidence. of any such consent. All persons having been forbidden to interfere with the property in the custody of the court, the appearance of creditors claiming maritime liens to prove the amount of their claims before the special master in this proceeding in personam cannot be considered such consent. Lien creditors have a right to proceed in personam or in rem on their liens, or in both ways, until they obtain full satisfaction. A court of bankruptcy would apparently have a right to sell free of maritime liens. Such courts are created by statute, and it has been held in decisions under the bankruptcy acts of 1841, 1867, and 1898 that they have this power under those statutes. These courts, however, proceed in rem. They seize the bankrupt's estate and finally distribute it among all his creditors, and as Congress may pass laws impairing the obligation of contracts, they are empowered to discharge the bankrupt from all liability for his debts.

In this case the vessel and other property were sold in one lot for $7,500, subject to maritime liens as aforesaid, to the owner of $180,000 of bonds out of an issue of $200,000 secured by mortgage. A petition is now presented by the Hudson Navigation Company, which was represented at the sale, stipulating upon a resale to make a bid for the vessels, subject to all liens, of $16,000. All the creditors had, or by exercise of ordinary diligence in examining the testimony taken before the special master might have had, full information as to the character and status of lien claims. If the purchaser were a stranger, who would make a personal profit to the extent in which he defeated creditors claiming maritime liens, I should be inclined to order a resale. There will, however, be nothing for the general creditors, and the entire contest is between the holders of bonds secured by the mortgage to the amount of $200,000 and creditors who claim maritime liens to the amount of $36,000. Maritime lien creditors have a priority over the bondholders, and the bondholders have a priority over all general creditors.

The situation accordingly is this: If the vessels are, for the purposes of illustration, worth $50,000 free of liens, and that is the highest estimate worthy of consideration, the purchaser will be getting a profit of $24,500 in case he defeats them. This, however, should be regarded really in reduction of his claim as a bondholder. On the other hand, if the creditors claiming liens prevail to the amount of $36,000, he will have to pay them, and the amount of his bid will be really increased to $43,500. If, as seems probable, liens to not over $16,000 are sustained, his bid would be $23,500. The actual expenses of the receiver now foot up to $6,000, which may be decreased by the return of insurance premiums to say $5,000. But after deducting these expenses, and allowances for fees of the receiver, of the special master, of the receiver's counsel, and of the complainant's counsel, it is very unlikely that there would be left enough out of a bid of $16,000 to give bondholders a dividend of 2 per cent., 90 per cent. of which would go to the present purchaser. Creditors claiming maritime liens are not interested, because if they prevail they will apparently be secured by their liens on the vessels, and if they do not their claims, being subsequent to those of the bondholders, will not be reached.

The object of the sale being to benefit creditors, and not to benefit the officers of the court, I do not think that a resale would be of any advantage. An order may be submitted confirming the sale.