### HUDSON v. NEW YORK & ALBANY TRANSP. CO.

### EMPIRE TRUST CO. v. HUDSON.

(Circuit Court of Appeals, Second Circuit. May 8, 1911.)

No. 245.

1. JUDICIAL SALES (§ 55*)—VACATION—RIGHTS OF PURCHASER—EXPENDITURES ON PROPERTY.

More than a year after vessels had been sold by a receiver in a creditor's suit against the owner, the sale was set aside under mandate from the appellate court because of misstatements inadvertently made by the auctioneer respecting liens subject to which the sale was made, which tended to materially lessen the bids, and the vessels were taken back and resold. In the meantime they had been in possession of the purchaser, which had used them, but without profit, and had also expended a large sum in repairs and betterments, which, as shown by the result of the second sale, had added more than that amount to their market value. *Held* that, under such circumstances, the purchaser was entitled to receive from the proceeds, in addition to the amount paid on its bid, the full amount expended on the vessels which contributed to such increase in value; that it was not chargeable for the use of the boats, from which it realized nothing.

[Ed. Note.—For other cases, see Judicial Sales, Cent. Dig. § 110; Dec. Dig. § 55.*]

2. JUDICIAL SALES (§ 55*)—VACATION—RIGHTS OF PURCHASER—PAYMENT OF CLAIMED LIEN.

A purchaser of vessels at a receiver's sale in a suit against an insolvent corporation, subject to such liens as should be established, who paid off a claimed lien which had been sustained by the master but was subsequently held invalid by the court, on a subsequent setting aside of the sale and a resale of the vessels was not entitled to be reimbursed from the proceeds for the amount so paid out, as against other creditors, but only to be subrogated to the rights of the lien claimant as a general creditor.

[Ed. Note.—For other cases, see Judicial Sales, Cent. Dig. § 110; Dec. Dig. § 55.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit by George P. Hudson against the New York & Albany Transportation Company; the Empire Trust Company, trustee, intervener. Complainant, the Farmers' Bank at Georgetown, the Trust Company, and Joseph H. Choate, Jr., receiver, appeal from decrees distributing a fund in court and allowing claims in favor of the Manhattan Navigation Company.   Modified and affirmed.

The following is the opinion of the Circuit Court, by Hough, District Judge:

[1] The boats Frank Jones and Saratoga over which this litigation has been waged, having been sold pursuant to order filed herein September 16, 1910, and $76,000 having been bid and paid for them, Manhattan Company, as substantially the purchaser at the sale of 1909, prays for whatever sum it is entitled to out of the present fund in the light of (a) the opinion of the Circuit Court of Appeals in this cause and (b) such other evidence as has been brought to this court's attention since mandate filed, and therefore unknown to the appellate tribunal.

The Manhattan Company having already been repaid the former purchase price of $7,500, interpretation of the higher court's opinion is confined to a consideration of what "sums may have been expended on the boats in repairs and betterments" and a determination of "the amount expended in repairs, and the difference between the receipts derived from the operation of the boats and the expenses of operation, deterioration, etc."

In memorandum herein of September 1, 1910, it was held to be the fair meaning of the opinion under which the mandate issued that, while that court had not held that a person in the position of the Manhattan Company had no other rights, the only rights specifically accorded such person were those growing out of his care of the property and the bestowal of betterments upon it, of a nature which at least maintained, if not improved, conditions existing at the time of sale.

Applying this reading of the opinion to the facts then shown, it was further held that Manhattan Company's rights were strictly confined to repayment of what it had put into the boats as physical structures on the theory that by such expenditures the vessels had either been actually improved or at least maintained in good, serviceable, and salable condition.   To these views I adhere without further discussion of a matter, upon which opinions have become wearisome to all concerned.   If "betterments" be taken in its usual meaning, of something added to the value of a thing otherwise than by mere repair, it cannot be said to have been shown that either the Jones or the Saratoga was bettered during the 14 months' possession of Manhattan Company, in any other substantial respect than the rebuilding of the wheel boxes of the Saratoga.   This was done, but at what exact cost is not shown, and the court is left between the estimate recently given of $5,000 and the estimate of $8,000 stated in the affidavit of MacLaurin, filed July 29, 1909.

In measuring, however, the value of what Manhattan Company did with and for these vessels, there are in my opinion some figures now incontrovertible which speak louder than anything else in the case.   If there be considered (1) what competent persons thought the boats worth in July, 1909; (2) what any person was prepared to bid for the boats at the same time; and (3) what the boats sold for in September, 1910—some information is gained which is to me controlling.

On or about July 29, 1909, there were filed herein certain affidavits regarding the then value of the vessels, containing statements not since gainsaid nor added to; although it was provided by the order of August 24, 1910, that all parties should be at liberty to show "what is the value of said steamboats and both of them in the markets of the city of New York at the present time."   The object of that section of the order referred to was to ascertain, if possible, what was the probability of a greater value, and therefore higher price in 1910, than in 1909.   No testimony was offered, and it was agreed by counsel that the affidavits of the previous year fairly represented the agreement and divergence of those acquainted with the vessel market of this port.

It is interesting to sum up the result of said affidavits: Mr. Walmsley (for the receiver) deposed that Mr. Noble of the Joy Line and Mr. Barlow, a shipbroker, valued the Jones at not over $40,000, and Mr. Barlow assigned $10,000 as the worth of the Saratoga. Mr. Whitcomb, the president of the Jones' previous owner, was sure that that vessel had been worth $100,000 in 1905, and, being acquainted "in a general way with her present condition," he believed that she was worth in 1909 from $50,000 to $75,000. Mr. Nichols, a vessel owner, had known the boats for about two years, and both together were in his judgment worth no more than $28,000 to $33,000. Mr. Gallaher of the Central Vermont Railroad valued the Jones at $25,000 and the Saratoga at no more than $7,500. MacLaurin of the Morse Company thought the Jones was worth at private sale about $25,000, but that she could not bring at public auction more than $20,000; while the Saratoga was worth nothing except to be broken up. And Mr. Frincke of the same company gave the sale price of both vessels together at $25,000.

Doubtless several of these affidavits were made by interested parties; but it cannot be denied that they are statements on oath of a body of men whose opinions are entitled to consideration, and no better opinion evidence has been offered throughout this bitter litigation.

Let these statements be compared with the opinion entertained and acted on by Mr. Duval of the Manhattan Company, who by his own testimony was willing to give up to $40,000 for the two vessels (free and clear), when he had immediate use for them in his own .business. From this examination of the evidence I conclude that no reasonably careful man considered the sale price of these two steamboats in 1909 to be more than $40,000 (free and clear of all liens).

Turning to the circumstances of the sale of 1909, it is obvious that, however erroneous were the statements of the auctioneer, it is more than doubtful whether any would-be purchaser was thereby deceived or discouraged, except possibly Mr. B. R. Robinson, attorney for the Hudson Navigation Company, who was willing to bid $10,000 subject to liens, on behalf of a client having every motive to keep the Jones and Saratoga out of competitive business on the Hudson river. It does not appear that Mr. Robinson attended the sale, and it is a fair inference that he had ascertained before making his affidavit of July 29, 1909, what the probable amount of liens would be—a matter easily and quickly to be accomplished at the office of Mr. Wise. The result is that no one was willing in 1909 to pay as much as $40,000 for these vessels free and clear except Mr. Duval; and the best bid from any one else, of which the record furnishes even a suspicion, is that of the Hudson Navigation Company, whose would-be bid meant not over $34,000 (free and clear).

This being the proven condition of the market in 1909, no evidence has been given (though opportunity offered) that market conditions changed in a year; yet after most unusual competition these two vessels were sold for $76,000 in cash, 14 months after Manhattan Company thought it had bought them for approximately $23,000 (free and clear).

What has caused this great appreciation in value? If the vessels were worth $40,000 in 1909, why were they worth $76,000 in 1910? I think the answer plain. It has been shown that, within the meaning of repairs and betterments hereinabove set forth, Manhattan Company has expended therefor—on the Frank Jones $14,169.29 and on the Saratoga $17,263.93, a total of $31,432.22. In other words, there is no other reasonable explanation for the increment in value of these vessels except this: That whereas in 1909 they were little more than rusty hulks, lying where they long had lain in a sort of marine graveyard under conditions which naturally affected their market value; in 1910 it had been demonstrated that they could be used, they had been kept in going and serviceable condition and were offered for sale without any preliminary period of rust and with a prompt obedience to the court's mandate as commendable as it was unexpected. My conclusion is that although (as above stated) it cannot be definitely shown, as to any vary considerable fraction of this $31,432.22, that the same was spent for what are technically betterments, yet the whole expenditure resulted in an increase in market value of these vessels greater than the total amount paid out, to wit: There was an increase in sale value of $36,000 as a result of expenditures of less

than $32,000. Therefore the Manhattan Company should be allowed in re-coupment for betterments and repairs said sum of $31,432.22.

This proceeding may be fairly described as intended to put back the two vessels into the receiver's hands that he might sell them as he should have sold them. But he has no right to expect to sell that which did not exist in 1909, without paying for it what the first purchaser laid out thereon.

But that which said purchaser laid out on the boats, if productive of no advantage to the second sale, does not seem allowable in recoupment. This leads me to deny any allowance to the Manhattan Company for insurance—an item which until lately seemed justified.

It has been strenuously urged that there should be charged against Manhattan Company in diminution of their repair and betterment bills some amount for (a) deterioration; (b) user of the boats; (c) consumption or destruction of a part of the ship's inventory or equipment.

No deterioration, however, has taken place, and the use of the boats did not result in any profit or advantage to Manhattan Company; on the contrary, they lost money by having them. As to equipment losses, it has been impossible to arrive at any basis of deduction because (1) no money value has been affixed to those items of equipment in which shortage exists, and (2) it is conclusively shown that in some items of equipment there is an overplus existing in 1910 as compared with 1909, and all that can be said regarding the comparative shortage and overplus is that these articles in which a surplus exists are apparently greater in intrinsic value than those in which there is a shortage.

On this point it is further worthy of consideration that (as above shown) there is a far greater appreciation in entire value than the amount of any suggested shortage.

It is further, however, urged that, irrespective of any actual profit or loss made or incurred by Manhattan Company, rent must be paid merely because the boats were used.

It can hardly be said that rental (or rather a charge for use and occupation) can be exacted for a thing which is intrinsically worthless unless there be a contract fixing such rent or charge. Whether a thing be worth anything or not depends not only upon the thing itself but upon the person who owns it. The true inquiry is: What was the rental value in the hands of the receiver of these boats? It appears to me that to state this inquiry is to answer it—the rental value was nothing, for the broken down hulks he had in 1909.

The theory of this proceeding is that, whereas the receiver did by inadvertence sell the boats for what was supposed to be about $23,000 free and clear, he ought to have sold them in 1909, for about $40,000 free and clear—and by boats is meant not only hull and machinery, but also tackle, apparel, and furniture. Under present conditions he has sold at that rate—and more. All the demands therefore made against Manhattan Company in diminution of the amounts repayable to them for betterments and repairs are denied.

A more perplexing question is that presented by the proven fact that within a few days after the sale of 1909, and before any exceptions to Mr. Wise's report had been filed, Manhattan Company paid $12,500 on the alleged lien of the Morse Dry Dock & Repair Company, and subsequently and on October 1, 1909, paid a further sum which made the total payment nearly $600 over the lien reported by the special master and now set aside by the court.

This matter has already been so often discussed that further argument in this court is useless. As intimated in the opinion on liens filed herewith, I am convinced that Capt. Hudson, as president of the corporation that owned the Jones and Saratoga, knew that the Morse Company's lien was in part good. It is not supposed that in believing this he had any especial familiarity with either the lien law of New York or the decisions thereunder, but he had been a seafaring man, he knew perfectly well the nature of a lien, and I am sure that he believed that he had made the boats responsible for the work that the Morse Company did upon them. The Manhattan Company acted on his advice, and in accordance with the only information, down to that time given the world by this court, in the matter of liens upon these steamers. That is, the court had appointed Mr. Wise (inter alia) to ascertain what liens or priorities existed, and the propriety of that appointment has not even yet been questioned. To be sure, it is hard to see why the master should have been

authorized to ascertain a lien or priority which the court could not, or would not, enforce. But those who deny any help to Manhattan Company in the finding of the master must hold either that he was appointed to satisfy curiosity (which is unthinkable), or the appointment was error (which has not yet been pointed out, and which I have no power to indicate or assert).

What was Manhattan Company then to do, about a lien which the duly appointed judicial officer of this court said was good, which the court itself would not transfer to any fund, nor divest by any sale, which was asserted by the concern having physical possession of the boats, and could only be put into litigation by giving stipulations for the whole amount claimed, or considerably more than had been declared valid; and against which lien if asserted in admiralty their only known witness was Hudson, who counseled payment.

It was indeed a hopeless litigation, that stared in the face the purchaser of 1909, and what made it seemingly hopeless was the action of this court.

The proverbial difficulties of selling pigs in pokes are scarcely greater than those of selling such singular property as ships subject to unknown liens; and therefore (it is presumed) were those liens ascertained as far as possible; and I, at least, decline to punish one who trusted the power of the court, and followed its recommendation.

It is therefore my opinion that, up to the extent of the amount reported by the master, equity demands that the Manhattan Company should be protected in their payment. They are therefore further entitled to be paid the amount of the Morse lien reported by Mr. Wise $13,090.56, and also the lien of Burns Bros. allowed by the master and now confirmed by the court, there having been on exception filed thereto. This was $808.50. Making a total of $13,899.06.

If to this be added the amount previously allowed, $31,432.22, the total allowance to the Manhattan Company is $45,331.28.

The final contention of the bondholders who have so largely profited by the resale of these vessels rests upon facts first made to appear at the hearing of August, 1910. They are briefly recapitulated in the memorandum of September 1, 1910; it being there said that the complainant Hudson and the Manhattan Company were cognizant of a "scheme which through ignorance or deceit does constitute a plain deception of the court and a fraud upon the law." And the facts which constituted said scheme were "stated at considerable length because it may ultimately be held that they affect the equities of the situation." It is now asserted (to quote from one of the briefs submitted) that the "fraud on the court that was prepetrated or participated in by Manhattan Company precludes it from claiming the right to reimbursement for betterments and repairs on equitable grounds."

This very extreme contention requires some further investigation. It is admitted at once that a fraudulent purchaser is not entitled to any allowance for expenditures he makes upon that which he obtained by fraud; he is punished as a quasi criminal by being deprived of that which he tortiously obtained, and by losing everything that he put into it during his fraudulent possession. It is therefore necessary to look carefully into the circumstances revealed by the evidence and find out just what the fraud was referred to in the earlier opinion herein and who participated in it either by active assistance or keeping silent when the means of speech were obvious and at hand. The statement of facts made on September 1st need I think be only amended by pointing out that Duval finally agreed to settle with Hudson not upon the basis of $50,000, but on that of $40,000 only.

In the mere fact that Hudson and Duval attended the sale of July, 1909, in the belief that the steamboats were worth to them at least $40,000, and with the intention of getting them for as much less than that sum as other bidders permitted, there was of course no fraud whatever; any one had a right to get the boats as cheaply as possible. When, however, a motion was made to set aside that sale and the grounds of motion alleged to be (a) inadequacy of price and (b) the "inadvertence of the auctioneer," Hudson came forward with the affidavit already sufficiently described. The powerful influence of that affidavit is more than plain from the opinion of Ward, J., filed July 29, 1909. Here was the fraud, and the only fraud, for the Manhattan Company had gotten, as it had a perfect right to get, what looked like a good bargain, and it was entitled to use all fair means to maintain the ad-

vantage thus gained; but this affidavit was not fair or true. It is apparent from the affidavits submitted on the motion to set aside the first sale, and from all the testimony taken since, that, as long as the sale was made subject to liens, no substantial improvement in price could be expected; so that when the party which knew all about the liens, and knew through Hudson whether they were really good or bad, advanced the proposition that $18/20$ of the bondholders of the defendant corporation were satisfied with the sale, they were using an argument unanswerable if it were true; and I remain of the opinion that, if Hudson and Duval did not know that what Hudson said was untrue, they had no right to make their ignorance the excuse for such an assertion.

But who was acting with Messrs. Duval and Hudson? At that time the Georgetown Bank was through Hudson endeavoring to gain an illegitimate advantage for its $70,000 par value of bonds over all other bondholders, and they had made Hudson their agent to accomplish the scheme. Mr. Townsend, representing the Baltimore Trust Company, was entirely satisfied with the scheme and knew all about it at the time of sale. In other words, apparently $81,500 par value of these bonds were actively interested in putting Hudson forward as that which I cannot persuade myself he really was or had any right to believe himself to be, i. e., the owner of $180,000 of defendant's bonds.

Yet the owners of those very bonds, having changed front with the decision of the Circuit Court of Appeals, now appear with new counsel and profess a virtue as vociferous as unconvincing.

Substantially all the rest of the bonds appear from this record to have been in the possession of the Empire Trust Company, whose attorney set forth in his affidavit of July 29, 1909, that that company was acting "at the request" of the holders of $85,000 of the bonds of the defendant corporation, and that subsequently the owners of $21,000 more had deposited their bonds with the intervening trustee. In other words, the face of the record as it stood in July, 1909, showed that Hudson could not own and control $180,000 par value of the bonds in question, unless he owed (owned) and controlled nearly all of the $106,000 par value in the physical possession of the intervener, and that intervener knew that Hudson did not control them.

Thus there was a deception of the court promoted by the legal owners of nearly half the bonds of defendant corporation, and acquiesced in by the trustee which controlled nearly all the rest; for nowhere in the assignment of errors upon the appeal herein does any reference appear to the conclusion drawn by the court from Hudson's affidavit. This conduct on the part of the intervener is strangely inconsistent with the position of innocent trustee now asserted and lends more color to Hudson's curious notions regarding "ownership" in bonds than has hitherto appeared.

Upon the whole, I am unable to see why, when, as a result of this tragedy of errors, all bondholders of every class have realized a fund in 1910 far greater than they had any reasonable expectation of ever seeing in 1909, there is any ground for visiting upon that offender, who was no more ignorant or reckless in assertion than the other parties to this case, such a frightful penalty as is contended for by the quotation from argument last made above.

Manhattan Navigation Company may take an order for the payment to it of $45,831.28, upon condition of its abandoning in writing every portion of its appeal now pending, except so much thereof as claims the right to be reimbursed or compensated for expenditures other than those upon the hull or fabric of the vessels; and an order may also be taken referring the distribution of the fund now in court (after payment as aforesaid to Manhattan Navigation Company) to a master for consideration and report to the court.

Cowing, White & Wait (Henry Crofut White, of counsel), for Empire Trust Co.

Herbert J. Bickford, for receiver.

J. Parker Kirlin, for complainant bondholders.

Kelley & Connelly (A. I. Elkus, M. E. Kelley, and C. S. Lorentzen, of counsel), for Manhattan Navigation Co.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. This litigation was before us on a former appeal, and reference may be had to the opinion then filed. 180 Fed. 973, 104 C. C. A. 129. It will be sufficient now briefly to state the sequence of events which resulted in the decrees appealed from.

A stockholder of the New York & Albany Transportation Company having brought suit to have its assets marshaled and distributed, the Empire Trust Company, as trustee under a mortgage, intervened and filed bill of foreclosure. A receiver of all the property of defendant was appointed, and he took possession of the same. Various creditors filed claims against the estate; some of them claiming to have liens of one sort or another. The defendant owned two river steamboats, the Saratoga and the Frank Jones, which it was decided should be sold forthwith, as they were likely to deteriorate in value unless kept in commission. The court ordered these two vessels to be sold at public auction, "subject only to maritime liens or liens under a state law for supplies, labor, or materials furnished on the credit of said vessels." The vessels were sold, subject to such liens, on July 27, 1909, for $7,500, to Edward C. Burns, concededly acting for the Manhattan Navigation Company. The sale was duly confirmed by the Circuit Court, and from the order directing a sale and the order confirming the sale appeals were taken.

It appearing that at the sale the auctioneer had made a statement as to the probable amount of maritime liens and liens under state law, which the purchaser would have to satisfy, which was greatly exaggerated and calculated to deter prospective bidders from making offers to purchase, the order confirming the sale was reversed. As to the order of sale, it was left to the Circuit Judge to determine, after investigation, whether there was any likelihood that a resale would produce a substantial increase in the price paid for the boats. As a result of such investigation, the boats were resold at a net advance of over $20,000. The purchaser paid $76,000 in cash. The present appeal concerns the disposition which the Circuit Court has made of the proceeds of this sale.

Except as to a single item we concur with Judge Hough as to the disposition of the proceeds and do not find it necessary to add anything to his exhaustive and careful review of the facts, or to his statement of the reasons which induced the conclusions he reached.

[2] The item in question is a claim of the Morse Dry Dock & Repair Company for $13,090.56, which had been paid as a claim secured by lien, by the purchaser at the first sale. Repayment of this amount was ordered to be made to such purchaser. The Morse Company's claim was for work done and materials furnished at the home port of the vessel; no maritime lien under the general admiralty law was claimed—none, in fact, could be claimed—but it was asserted that, by compliance with the state statute, the creditor had obtained a lien under the law of the state of New York. When the suit was brought an order was made that all creditors of the defendant should file their claims with the receiver and that all claims filed which might be disputed and all for which any priority is claimed be referred to a spe-

cial master "to take proof of the amount of such claims and of the priorities thereof, if any, and report the same to the court." Thereupon the claim of the Morse Company was filed: it claimed priority by reason of its alleged lien, and it appeared and introduced testimony in support, not only of its claim, but also of such lien before the special master. Subsequently to the entry of the order confirming the sale, the special master reported that the Morse Company had liens on the respective vessels for the amounts named. Exceptions were duly filed to his report, and it was eventually held that, because of its failure to comply with the requirements of the statute, the Morse Company had not acquired any lien under the state law, but was merely a general unsecured creditor of the defendant to the amount named. Subsequent to the filing of the special master's report, and before the same came up for consideration by the court, the purchaser at the first sale paid this claim of the Morse Company.

Upon the former appeal we held that, if the first sale were set aside, "the property cannot be retaken from the purchaser without paying him the purchase price $7,500 and whatever other sums may have been expended on the boats in repairs and betterments." It was intended, of course, to include as purchase price, in addition to the $7,500, whatever the purchaser might have had to pay in order to extinguish existing maritime or state liens so as to perfect his title to the property. But it is only liens which, if not paid, would be a cloud on the title that should thus be provided for. The mere assertion of a lien, which could not be maintained by proof, was not sufficient to require its payment or to entitle the person paying it to reimbursement out of the proceeds. The first purchaser seems to have acted in good faith, in paying this Morse claim; the special master having reported that it was a valid lien, although the order which sent it to him apparently authorized him only to "take proofs and report the same." Moreover, the president of defendant told the purchaser that the lien was good and should be paid. But in paying it before adjudication as to its validity the purchaser took the chances. If the first sale had not been set aside, the payment by it to the Morse Company of a debt due to that company by the New York & Hudson Transportation Company, unsecured by a valid lien, would have resulted in a loss of the money so paid to extinguish another person's debt, except for what it might be able to obtain through subrogation, by prosecuting the claim of the Morse Company against the defendant's estate. So far, therefore, as this sum of $13,090.56 is concerned, its situation is not affected by not being repaid that sum from the proceeds of the sale; it had already lost the money (before resale was ordered) except for what it might obtain by subrogation, and its right to prosecute the Morse Company's claim has been in no way affected by subsequent proceedings.

To repay this sum to the Manhattan Navigation Company out of the proceeds of the sale would be, in substance and effect, to give priority to the unsecured claim of the Morse Company over the bondholders secured by the mortgage.

With this modification the decrees are affirmed.